# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JIMMIE W. SUMPTER, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. CIV-11-405-FHS-SPS |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the Social** | ) | |
| **Security Administration,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

The claimant Jimmie W. Sumpter, Jr., requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision and asserts the Administrative Law Judge ("ALJ") erred in determining he was not disabled. For the reasons set forth below, the Commissioner's decision should be REVERSED and the case REMANDED for further proceedings.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Ms. Colvin is substituted for Michael J. Astrue as the Defendant in this action.

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Sec'y of Health & Human Svcs.*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of

---

[2]Step one requires the claimant to establish that he is not engaged in substantial gainful activity. Step two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity (RFC) to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born June 23, 1967, and was forty-three years old at the time of the administrative hearing. (Tr. 28, 110). He completed the tenth grade, and has no past relevant work. (Tr. 21, 153). He alleges that he has been disabled since November 1, 2007, due to depression, mental problems, and flashbacks. (Tr. 150).

## Procedural History

On April 2, 2009, the claimant filed for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. His application was denied. ALJ Michael A. Kirkpatrick held an administrative hearing and determined the claimant was not disabled in a written opinion dated November 16, 2010. (Tr. 12-22). The Appeals Council denied review, so the ALJ's written opinion represents the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. § 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant had the RFC to perform the full range of work at all exertional levels but with the non-exertional limitation of only performing simple, unskilled tasks (but not complex or detailed tasks) which do not require interaction with the general public. (Tr. 16). The ALJ then concluded that the claimant could not return to his past work, but he

was nevertheless not disabled because there was work he could perform in the national and regional economies, *i. e.*, general laborer, cleaner, and poultry dresser. (Tr. 22).

## Review

The claimant alleges that the ALJ erred: (i) by improperly assessing his RFC and (ii) improperly assessing his credibility. The undersigned Magistrate Judge finds that the ALJ *did* fail to properly evaluate the claimant's credibility, and the decision of the Commissioner should therefore be reversed.

The ALJ found that the claimant had the severe impairments of adjustment disorder with depressed mood and borderline intellectual functioning (including a valid full-scale IQ score of 80). (Tr. 14). The medical evidence contains no treatment records for the claimant, but the ALJ ordered several consultative examinations. As to the claimant's mental impairments, the claimant attended a consultative mental status examination on January 9, 2008, and was driven there by a family member. (Tr. 196-198). The examiner noted that the claimant had been hospitalized for psychiatric reasons when he was 17 years old due to suicidal indications, but the claimant explained it away as attention-seeking behavior. (Tr. 197). As to the claimant's appearance, the examiner noted that the claimant's jaw appeared deteriorated in a manner often seen with methamphetamine use although the claimant denied drug use, and noted the claimant's reports of manipulating the system to get "get a 'fair shake.'" (Tr. 197). The examiner's impression was that the claimant was an evasive historian, but that there appeared to be no mental illness present. (Tr. 198). Two state reviewing physician also concluded that the claimant had no medically determinable impairment. (Tr. 210, 230). A second

consultative mental examination on October 27, 2008, resulted in a similar impression. The examiner noted that the claimant was disheveled in appearance but cooperative and friendly, that he had minor deficits in social judgment and problem solving, that he did not appear to have depression, and that he may have had a history of alcohol abuse. The examiner further recommended counseling on managing issues that had led to the removal of his children from his home. (Tr. 227-228).

The claimant submitted to a third mental status examination on June 16, 2009. (Tr. 244). The examiner noted that the claimant's judgment appeared to be grossly intact mildly impaired, and that insight into his problems appeared mildly impaired "possibly due to his naivety and his intellectual functioning." (Tr. 246). The examiner stated that there was evidence of a bipolar disorder and that the claimant may meet the criteria for that, and that the symptoms were "very likely" to impair his functioning in occupational, social, or academic settings. (Tr. 247). The examiner concluded, "Given his borderline intellectual functioning and his poor judgment and lack of ability, I think it would be very difficult for him to be successful in many occupations." (Tr. 247). During a fourth psychological examination, the examiner noted that the claimant had driven himself to the appointment, then noted that the administration of the Wechsler Adult Intelligence Scale-III (WAIS-3) and the Wide Range Achievement Test-III (WRAT-3), which yielded a verbal IQ score of 83, a performance IQ of 80, and a full scale IQ of 80, which is in the borderline range. (Tr. 250). The examiner also assessed the claimant with a global assessment of functioning ("GAF") score of 59. (Tr. 250). State reviewing examiner Dr. Ron Smallwood completed a mental residual functional capacity checklist, finding that

the claimant was markedly limited in understanding and remembering detailed instructions, carrying out detailed instructions, and interacting appropriately with the general public. (Tr. 252-253). He also completed a psychiatric review technique checklist, finding the claimant had moderate limitations in restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace, but that he had experienced no episodes of decompensation of extended duration. (Tr. 266).

The claimant testified at the administrative hearing that he was put in DHS custody when he was twelve years old, placed in a psychiatric hospital when he was sixteen (but he had been suicidal "for attention"), and later transferred to a mental health center for suicidal actions, and that he attended special education classes in high school. (Tr. 30-31). The claimant further stated that he did not drive and that he used to have a driver's license, but that it had taken him numerous tries to pass both the written and driving portions. (Tr. 32-33). He testified that he did not have his license anymore because of back child support. (Tr. 33-34). When questioned as to why he did not have much work history, he explained that he lost his most recent part-time job (where he worked less than a month) because he kept forgetting to go to work. (Tr. 34). The ALJ stated that it was his impression that the claimant just did not want to work, and the claimant explained that he really had gotten the times wrong for when he was supposed to go in to work and that before that he had needed to stay home with his children because his wife was not able to look after them properly. (Tr. 35-37). When asked why he was not working, the claimant stated that he felt like his life was worthless, and the

ALJ responded, "Wouldn't the solution be to go out and get a job and accomplish something?" (Tr. 39). The claimant, when discussing the fact that his three children had been removed from his home, testified that he missed them and had "flashbacks" where he believed he was in the room with them. (Tr. 39-40). He said that he had problems remembering and concentrating, and that he was depressed. He explained that he had tried to sign up for counseling services, but that there was a six-week wait to get in. (Tr. 41-42). He stated that he cooked for himself, *i.e.* putting eggs in the microwave, that he saw to his own personal hygiene, that his landlord would help him when he needed to get around, and that that he mowed his lawn because it was in his lease agreement. (Tr. 43-44). He stated that he attends church once a week, walks to the nearby casino for free soft drinks but does not gamble, that he used to love to read but does not anymore, and that he stays up late most nights on the computer. (Tr. 46-47). He said that he used to take Seroquel for nightmares, but that he stopped taking it when he ran out of assistance from TANF. (Tr. 47-48).

The ALJ summarized the testimony of the claimant, then stated, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 17). The ALJ then summarized the available medical evidence and further explained that he found the claimant not credible because the claimant could perform activities of daily living and personal care, he had

driven himself to his most recent psychological examination, he had received no treatment and took no medication (although he had in the past), his thought processes were logical and goal-directed upon examination, and his mood was noted as steady, upbeat, and affect full range. (Tr. 20-21). The ALJ specifically agreed with the consultative examiner who found the claimant would have difficulty being successful in many occupations, but interpreted that to mean that he could be successful in simple occupations that did not require interaction with the general public. (Tr. 19).

Deference is generally given to an ALJ's credibility determination, unless there is an indication that the ALJ misread the medical evidence taken as a whole. *See Casias*, 933 F.2d at 801. In assessing a claimant's complaints of pain, an ALJ may disregard a claimant's subjective complaints if unsupported by any clinical findings. *See Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987). But credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) [quotation omitted]. A credibility analysis "must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in the regulations.'" *Hardman v. Barnhart*, 362 F.3d 676, 678 (10th Cir. 2004), *quoting* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4 (July 2, 1996). The ALJ's credibility determination fell below these standards. The specific reasons given by the ALJ for finding that the claimant's subjective complaints were not credible are not entirely supported by the record. For example, the ALJ discounted the claimant's credibility because he could see to his own personal hygiene, had driven himself to one out of numerous consultative examinations,

was not in treatment, and he was not taking any medication at the time of the hearing, while discounting the claimant's statement that he stopped taking medication when aid from TANF ran out and he sought treatment but was told there was a six-week wait. *Miranda v. Barnhart*, 205 Fed. Appx. 638, 642 (10th Cir. 2005) ("'[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide.'") [unpublished opinion], *quoting* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *7.

Further examination of these perceived inconsistencies indicate that although the ALJ cited all the available evidence, he only interpreted it in a manner favorable to his foregone conclusions and ignored evidence that did not support his conclusions. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."), *citing Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984). For instance, the ALJ noted the consultative examiner's finding that it would be difficult for the claimant to be successful in many occupations, and stated that was consistent with his own finding that the claimant could perform all simple, unskilled tasks that did not require interaction with the general public. (Tr. 19). *See also Taylor v. Schweiker*, 739 F.2d 1240, 1243 (7th Cir. 1984) ("'[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.'"), *quoting Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982).

Further, the ALJ's credibility analysis preceded the medical evidence and consisted of the following: "After careful consideration of the evidence, I find that through October 26, 2007 claimant's medically determinable impairments could reasonably be expected to have caused the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 468). The problem with this analysis (apart from vagueness) is that the ALJ should have *first* evaluated the claimant's testimony (along with all the other evidence) according to the above guidelines *and only then* formulated an appropriate RFC, not the other way around, *i. e.,* the ALJ apparently judged the credibility of the claimant's testimony by comparing it to a pre-determined RFC. *See Bjornson v. Astrue*, 2012 WL 280736 at *4-5 (7th Cir. Jan. 31, 2012) (slip op.) (in addressing nearly identical language, "[T]he passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards. The administrative law judge based his conclusion that Bjornson can do sedentary work on his determination that she was exaggerating the severity of her headaches. Doubts about credibility were thus critical to his assessment of ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be."). *See also Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) ("[B]oilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the

ALJ considered in determining that claimant's complaints were not credible."), *citing Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001).

"Because a credibility assessment requires consideration of all the factors in combination, when several of the factors *relied upon* by the ALJ are found to be unsupported or contradicted by the record, [the Court is] precluded from weighing the remaining factors to determine whether they, in themselves, are sufficient to support the credibility determination." *Bakalarski v. Apfel*, 1997 WL 748653 at *3 (10th Cir. Dec. 3, 1997) [unpublished opinion] [quotation and citations omitted]. Accordingly, the Commissioner's decision must be reversed and the case remanded to the ALJ for further analysis of the claimant's credibility. On remand, the ALJ should properly evaluate the evidence, then re-assess the claimant's credibility. If the ALJ's subsequent credibility analysis results in any changes to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether he is disabled.

**Conclusion**

In summary, the undersigned Magistrate Judge PROPOSES a finding by the Court that correct legal standards were not applied and that the decision of the Commissioner is therefore not supported by substantial evidence. The undersigned Magistrate Judge therefore RECOMMENDS that the Commissioner of the Social Security Administration's decision be REVERSED and the case REMANDED to the ALJ for further proceedings. Any objections to this Report and Recommendation must be filed within fourteen days. *See* Fed. R. Civ. P. 72(b).

**DATED** this 11th day of March, 2013.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma